UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NYU WINTHROP HOSPITAL,

                           Plaintiff,

      -against-

MICROBION CORPORATION,

                           Defendant.

**ORDER**

CV 17-6114 (JMA) (GRB)

-------------------------------------------------------------------X

**GARY R. BROWN, United States Magistrate Judge:**

By this action, plaintiff NYU Winthrop Hospital ("Winthrop") seeks to correct the inventorship attributions of U.S. Patent Nos. 9,408,393 ("the '393 patent"), 9,028,878 ("the '878 patent"), and 8,389,021 ("the '021 patent") (collectively the "Microbion Patents"). DE 1 ¶1. These patents relate to Bismuth Thiols ("BTs"), alleged to be "a novel class of antimicrobial agents with broad applications." *Id.* This matter is before the undersigned upon the referral of the district judge for all discovery disputes. DE 15. Presently before the Court is a portion of a motion to compel relating to certain documents withheld ostensibly under the attorney-client and work product privileges and purportedly relating, in large measure, to invention disclosure forms prepared in connection with innovations concerning BTs that may concern the patents at issue.

**Background**

The following allegations are drawn from the Complaint herein: Plaintiff claims that the inventions are attributable, in whole or in part, to the work of Dr. Phillip Domenico, who was

1

employed by Winthrop through 2005, and during which period, Winthrop obtained several patents relating to BTs (the "Winthrop Patents") and Domenico was contractually bound to assign all inventions relating to BTs to Winthrop. DE 1, ¶ 17. After the employment relationship with Domenico ended, Microbion entered into a license and non-disclosure agreement with Winthrop. *Id.* at ¶ 18. Even after the termination of the employment relationship, Domenico had a continuing obligation to assign all inventions and improvements made to BTs to Winthrop if such advancements were made based upon confidential information acquired during his employment. *Id.* at ¶ 17. Winthrop further alleges that Domenico subsequently became a consultant and/or employee of Microbion, and that his duties included "assisting in drafting the patent applications for the Microbion patents." *Id.* at ¶¶ 20, 28.

Microbion requested that Winthrop provide Domenico's notebooks to assist in its endeavors; Winthrop did so "with the understanding that Dr. Domenico, acting as a consultant for Microbion, would review the notebooks to assist Microbion in understanding the chemistry of the BTs and/or developing products utilizing Dr. Domenico's inventions." *Id.* at ¶ 22. Notwithstanding the various non-disclosure obligations arising from the licensing agreement and employment arrangements, Microbion disclosed and claimed, in obtaining the Microbion Patents, confidential information and inventions made on behalf of Winthrop. *Id.* at ¶ 23.

Each of the Microbion Patents lists Dr. Brett Hugh James Baker as the sole inventor. Dr. Baker assigned his rights in the Microbion Patents to Microbion. *Id.* at ¶¶ 7, 30. "Notwithstanding Dr. Domenico's involvement in the conception of the inventions and preparation of the patent applications for the Microbion Patents, Microbion did not name Dr.

Domenico as an inventor on these applications." *Id.* at ¶¶ 29. On these facts, the complaint purports to set forth three causes of action seeking an order pursuant to 35 U.S.C. § 256 requiring the Director of the Patent and Trademark Office to issue a certificate of correction amending the inventorship status of each of the Microbion Patents. Winthrop also seeks attorneys' fees under 35 U.S.C. § 285.

**Procedural History**

This matter was commenced in October 2017 by the filing of a complaint. DE1. Judge Azrack held an initial conference in January 2018, setting forth a discovery schedule and referring discovery disputes to the undersigned. DE 15. Within three weeks, counsel for Microbion filed a motion to compel which was fully briefed by, and then resolved, by the parties and denied as moot. DE 19, 20; Electronic Order dated March 15, 2018. About a month later, counsel for Winthrop filed its first motion to compel – again briefed by the parties – but rejected by the undersigned based on a failure to meaningfully meet and confer consistent with applicable rules. DE 24, 25; Electronic Order dated May 7, 2018.

By September 2018, the parties continued to spar over discovery matters. After a series of filings which appeared, by and large, to dispute the contours of an anticipated discovery conference, the undersigned entered an order in which the parties were again cautioned about the importance of fully complying with the meet and confer rules. Electronic Order dated October 9, 2018. On November 2, 2018, the undersigned held a discovery conference with counsel at which a schedule was established to brief a motion to compel documents that Microbion had withheld from discovery, and numerous other rulings were made. DE 33.

The parties then filed extensive motions relating to the withheld documents and related issues. DE 35-46. One thing that became clear was, despite numerous cautions from the undersigned, counsel for Microbion continued to withhold documents on the basis of asserted relevance objections even though it made no showing or argument that production represented any sort of burden. *Compare* DE 42 at 21 -24 *with* DE 33 at 69-70.

In any event, the undersigned held argument regarding these motions – after again directing counsel to attempt to work together to reduce these issues – on January 14, 2019. At that conference, the Court worked with counsel to substantially narrow the matters at issue. Of the ten categories at issue, after review of the papers and extensive discussion with counsel, the undersigned ruled on eight of these categories. *See generally* DE 47. Regarding the remaining two issues, counsel for Microbion asserted that "if any of this is going to be done, it should be done with an *in camera* review first." DE 47 at 66-67. The undersigned agreed to conduct such a review under the firm belief that the quantum of material being submitted by Microbion in an effort to protect that which it claims is privileged would be reasonably reviewable. See DE 47 at 65 (counsel's estimate regarding one of the central categories as consisting of "probably [ ] several hundred documents, a couple of hundred documents.")

*Counsel's Position Regarding Deodorant Properties of BTs*

One matter worthy of mention is a representation made to the undersigned concerning patent claims encompassing the deodorant properties of BTs. During the conference, the undersigned had occasion to review an invention disclosure claiming deodorant properties associated with BTs – this invention disclosure, which had been produced to Winthrop and

4

clawed back (on the bases of relevance and privilege), was reviewed in Court with counsel for Microbion[1] in an effort to establish some ground rules for production and withholding of documents. As the Court had been focused primarily on the antiseptic qualities of BTs, the undersigned was unfamiliar with any claims of deodorant properties. The following colloquy followed:

> THE COURT: . . . I haven't decided yet but I think [the invention disclosure forms] are producible but I am denying [the motion to compel] as to the ones that are clearly unrelated, like the first one you handed me . . . deals with an odor problem, it doesn't deal with an infection problem.
>
> MR. SULLIVAN: Right.
>
> THE COURT: So I can't come close on that one to thinking that it's related to the patents at issue, right?
>
> MR. SULLIVAN: Right.

DE 50-1 (*quoting* DE 47 at 54:8–20); *see also id*. 48:8–14.[2]

Notwithstanding these representations to the Court, as counsel for Winthrop points out, one of the patents-in-suit, which is attached to the Complaint in this action, explicitly claims the following:

> Certain other embodiments . . . contemplate inclusion of . . . microparticulate BT compounds in . . . compositions for topical delivery to reduce underarm, foot or other body odors . . . BT compound, BisEDT, has been applied . . . to the axillary area [the armpit] in human test subjects and shown to neutralize body odors . . .

---

[1] The Court viewed the document in Court but, due in part to the vehement objections of counsel for Microbion, counsel for Winthrop (who had once seen the document after its erroneous production) was not permitted to review it.

[2] It goes without saying, Microbion shall produce the invention disclosure concerning deodorant properties of BTs and the related documents.

5

DE 50-1 (*quoting* 1-2, "'878 Patent," Col. 43:4–49).  In a written response, rather than acknowledge error, counsel for Microbion makes a convoluted argument that deodorant properties of BTs are irrelevant to this action.  DE 52.  The undersigned remains both unpersuaded and troubled.

*The In Camera Production*

Ultimately, the volume, disorganization and quality of the material produced proved astonishing.  Although the Court had repeatedly stressed to counsel that efficiency was a priority, that counsel should meet and confer to reduce the number of conflicts and had expressed concerns about the reasonable expectations from an *in camera* review, on January 29, 2019, counsel submitted documents "in hard copy, via *27 binder volumes*, and electronically via a memory stick."  DE 49 at 1 (emphasis added).[3]  Those binders fill seven bankers boxes which, arranged in a stack, form an edifice taller than this writer.  The pages are not Bates stamped, and the exhibits provided are numbered (and some with lexical prefixes), though they are not presented in numerical order.[4]  In a purported effort to assist the Court in its review of this mammoth production, counsel submitted three indices comprising multiple, color-coded

---

[3] An effort to employ the memory stick provided by counsel proved futile, as the USB drive – which was delivered directly to Chambers upon order of the Court – is protected by password encryption.  The method used to provide this password to the undersigned – or, indeed, whether it was provided at all – is not readily apparent.

[4] For avoidance of doubt, numerical order is commonly defined as "an arrangement of a series of items by numbers in a sequential order." *www.oed.com*.  "The earliest extant example of sequential numbering in a book is [found in] *Sermo in festo praesentationis beatissimae Mariae virginis*, which was printed in Cologne in 1470." *www.theatlantic.com*.  This manner of organization soon became standard.

spreadsheets which do little to simplify matters. DE 49 at 1-2. Unnecessary duplication and repetition of documents appears to be so rampant as to warrant the inclusion of a "Duplicates" column in Microbion's Master Index.

After the meet and confer directed by the Court – a procedure which, by design, is intended to reduce the number of disputes and the concomitant burden on the Court and the litigants – counsel for Microbion *increased* the corpus of materials to be reviewed, adding yet another volume. DE 49 at 2; DE 54 at 1 ("After meeting and conferring with Opposing Counsel and pursuant to the Court 's Order . . . Defendant Microbion Corporation respectfully supplements its submission . . . via 1 binder volume"); *Compare* Local Rule 37.3(a) ("the attorneys [shall] confer in good faith . . . in an effort to resolve the dispute").[5]

Casting itself in the role of David battling the giant Goliath, throughout this litigation, counsel for Microbion has regularly raised concerns about the costs and impact of this litigation. *See, e.g.,* DE 27 at 1 ("Microbion is a small, startup biosciences company with less than 10 employees developing treatments for resistant and difficult-to-treat infections. NYU is a major university hospital with over 8,000 employees and over $1 billion in annual revenue"); 2 ("NYU has exploited this discovery and resource asymmetry to impose costs and burdens on Microbion

---

[5] One of the first documents in the supplemental binder consists of an email exchange between Dr. Baker and a patent attorney describing, in sumptuous detail, a dinner buffet to be held on a yacht in Coal Harbor and the participant's ability to attend based on health concerns. *See* Document 4582. The only operative language in this lengthy exchange is a passing reference to sending "some xtal data patent samples." *Id.* In its index, Microbion describes this document as "regarding patent claiming for crystals." How counsel could consider this document subject to privilege, appropriately described in the index or warranting supplementation of this massive record after a meet and confer, defies imagination.

far in excess of what is warranted by this case") (*citing* Fed. R. Civ. P. 1); DE 47 at 111 ("the client is paying for all of this"). Counsel has even claimed that "Microbion has worked diligently to minimize issues *and avoid burdening the Court.*" DE 27 at 2 (emphasis added). Weighing the thousands of documents Microbion deposited with the Court for *in camera* review, it is hard to credit this claim.

Faced with this amalgam, the Court did not conduct a review, as there was no reasoned way to proceed with a sampling or other review technique, nor were any such suggestions proffered. The undersigned did, however, peruse a handful of documents in a single binder selected at random from the 28 binders of material produced. Even without an exhaustive review, and lacking a complete understanding of the factual details, the undersigned immediately uncovered several exemplars far distant from the perimeters of a reasoned privilege claim. A discussion of those items follow:

<u>Documents 2085 and 2084 – The "Choir Practice" Email Exchange</u>

Document 2085 appears to consist almost entirely of an email exchange between Drs. Baker and Domenico about some dealings with what appears to be a third party at a different organization asking that Domenico sign certain patent documents as a coinventor on BT-related patent applications, which Domenico declined because of his position with Microbion. The following exchanges largely relate to Domenico's availability for a discussion on the topic, but that his need to attend choir practice apparently interfered with these efforts. In a single side thread, Baker writes to an attorney asking, in sum and substance, "can we talk about this?", with no response from the attorney contained in the document. One cannot even imagine any claim of

attorney-client or work-product privilege that could arise from these communications, not one character of which was input by an attorney. The same could be said of Documents 2084 (which follows 2085) and 2083 (which follows 2084), each of which contains the same thread and an additional email regarding Dr. Baker's availability.

Document "Seed 2841" – Administrative Patent Documents

This conglomeration of records appears to consist of the transmission by a legal assistant at a patent prosecution firm to Dr. Baker of a series of documents issued by government patent offices in the U.S. and British Columbia along with a cover letter from a patent attorney. While the cover letter could – arguably – be deemed to contain some nuggets of "advice", the balance of the documents, which are substantial in number, largely concern administrative issues such as the payment of fees in connection with various patent applications and notice of missing documents. Even assuming, *arguendo*, that one believed that some (redactable) portions of the attorney letter constituted some advice subject to privilege, the balance of the documents are clearly producible.

Document 2036 – The Domenico Paper

This puzzling assembly consists of a one sentence cover email from Dr. Baker to Pat McKernan (who may have been an inhouse attorney at Microbion), along with a lengthy scientific paper by Dr. Domenico – clearly the type of factual, scientific data that falls well outside any claim of attorney-client privilege. The paper, dated December 10, 2009, filled with graphs, scholarly observations and scientific conclusions, seems to have been transmitted in a computer file curiously entitled "Domenico serial plagiarism.docx." That same paper appears as

9

part of a different collection marked as Document 2265. In the cover email, Dr. Baker states that he and another individual "were in the process of adapting" Dr. Domenico's work. This appears to evidence Winthrop's contentions regarding the at-issue waiver given Microbion's claims that Baker is the exclusive inventor of all its innovations. Furthermore, the paper is plainly subject to production.[6] *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney").

## DISCUSSION

Upon review of Winthrop's motion to compel, and after hearing argument and reviewing the submissions of Microbion, the undersigned directed the production of several categories of documents that Microbion had improperly withheld, while, in several other instances, sustained the assertion of privilege and/or directed the parties to further meet and confer. *See generally* DE 47. With respect to the two remaining categories, the undersigned determined that Winthrop had raised colorable questions[7] about the privileges asserted, and therefore found "it would be prudent to engage in an *in camera* review with respect to these documents." *Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*, 297 F.R.D. 22, 31 (D. Conn. 2014), *objections overruled*, 2015 WL 164069 (D. Conn. Jan. 13, 2015).

---

[6] Obviously, the undersigned rejects Microbion's assertion of privilege as to these documents to the extent discussed, and these items should be produced in the manner described. Counsel should, more importantly, extend the approach described here to other items in the production.
[7] In sum, Winthrop raised issues about, *inter alia*, waiver based upon the "at issue" or "sword and shield" doctrine. *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications").

The very small sampling conducted by the undersigned of the massive *in camera* submission made by Microbion seems to suggest that counsel failed to recognize that it was "his responsibility in the first instance to review the documents for which he was claiming privilege, and cull out the documents that clearly were not even remotely privileged." *McNamee v. Clemens*, No. 09 CV 1647 (SJ), 2014 WL 12775660, at *14 (E.D.N.Y. Jan. 30, 2014) (imposing sanction where "counsel took the easy way out by simply asserting privilege" when none existed).

Therefore, the undersigned hereby rejects the *in camera* submission provided by Microbion in this case, as the submission was, the Court finds, not made in good faith. While other more severe sanctions for this conduct are available including, potentially, the waiver of privilege and an award of attorneys' fees, the Court will not impose such remedies at this time. Rather, the undersigned will adapt the solution applied by my colleague Judge Pollak in *McNamee*, *supra,* and direct counsel for Microbion as follows:

1. Counsel will personally review each document for which privilege is being claimed in accordance with Local and Federal Rules, case authority and the Court's prior orders in this action. Counsel shall, obviously, make a supplemental production of such documents as to which Microbion is no longer asserting a privilege;

2. Counsel will provide a certification to the Court that he has personally reviewed each document and determined that the privilege is being claimed in good faith;

3. After such review and production, advise the Court of the number of documents, including a page count, of the documents that remain, and provide an updated

privilege log as to these items.

*McNamee*, 2014 WL 12775660, at *19. These steps shall be completed in the next sixty days. If a substantial number of documents remain as to which counsel claims a valid privilege exists, the Court will appoint a Special Master to review such claims. Should that become necessary, based upon the history of this matter, Microbion will bear all costs associated with the Special Master.[8]

**CONCLUSION**

Winthrop's motion to compel is GRANTED to the extent described herein. Counsel for Microbion will implement the steps set forth in this Order within sixty days of the date of this opinion.

Dated: Central Islip, New York
 March 11, 2019

     /s/ Gary R. Brown
     GARY R. BROWN
     United States Magistrate Judge

---

[8] The undersigned had cautioned the parties that the hiring of an outside expert to assist with the review of these documents could become necessary, and that such a step would involve substantial expense. *See* DE 47 at 55.